# H. C. Comegys, Thomas Davis, William R. Williams and S. M. Mayer, *v.* A. B. Russell, Joseph Davenport and Jerome Britton, Appellants.

*Mines and mining—coal lease—Royalty—Estoppel.*

R. made a coal lease to D. by which it was provided that royalties should be paid every six months, and if the amount due at the end of any half year remained unpaid for twelve months thereafter, the lease was thereby forfeited and the lessor was authorized to " enter and take possession without recourse to law." The lease was executed in 1887. On July 1, 1891, D. gave an option to plaintiffs to purchase his lease, one of the conditions being that they should test the character of the veins upon the tract by boring down through them. After the boring was done, plaintiffs in April, 1892, notified D. that they accepted his option. In July, 1893, plaintiffs called upon the lessor to pay any royalties due. The lessor said there was nothing due, but if there were, he would not take it from the plaintiffs. In September, 1893, the lessor re-entered for the nonpayment of royalties within twelve months after they had fallen due.

There was evidence that the lessor knew the plaintiffs were boring upon the land, and that he pointed out the lines of the tract to the plaintiffs while the boring was going on. *Held*, (1) that the plaintiffs took D.'s lease subject to all D.'s covenants, and they were bound to take notice of them; (2) that the fact that the lessor knew that the plaintiffs were negotiating with D. gave them no rights as against the lessor, except such as D. himself had, and imposed no duties on the lessor toward them, except such as he was under towards his lessee under the terms of lease; (3) that the plaintiffs knew and were bound to take notice of the fact that mining was going on under the lease, and that royalties were falling due each half year; (4) that the plaintiffs were bound to know whether the royalties were being paid, and what was the state of the accounts, the responsibility for which they were about to assume; (5) that as they had not paid or offered to pay the royalties they had no higher standing than their vendor so far as their contract rights were concerned; (6) that the lessor was not estopped as against the plaintiffs by the fact that he knew that the boring was going on, or by what he said in July, 1893.

Argued February 25, 1896.    Appeal, No. 70, July T., 1895, by defendants, from judgment of C. P. Lackawanna County, March T., 1894, No. 423, on verdict for plaintiffs.    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.    Reversed.

Ejectment for coal under a tract of land in Scott township. Before GUNSTER, J.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

[As a matter of law when an agreement has been entered into by parties, and subsequently another agreement is entered into by the same parties, intended to cover the same subject-matter, even though there should be some change or variation in the later agreement, if it be the intention of the parties that the later agreement should take the place of the former, then the second or later agreement is the one that is binding upon the parties, because the latest agreement between the parties is the one that is binding upon them.   Men always have the right to change their minds if they see fit; and if they choose to change their agreement, to vary the terms, provided it cover the same subject-matter, and is between the same parties, the later or last agreement is the one which is binding upon the parties and does away with the prior agreement.] [2]

[Now then, what agreement was referred to in this notice of April 25, 1892?   Was it the agreement which has not been offered in evidence?   If it was, then there is no evidence here to sustain the plaintiffs' case, because there is no evidence then that the plaintiffs elected to accept the terms of this lease which was acknowledged on the 14th of January, 1892.   On the other hand, if this was the instrument which they elected to accept, and under which they proposed to go on and mine the coal, then the plaintiffs' right became a vested right by such acceptance.   That is, if they expressed their election to Mr. Davenport under this agreement, then their right became a vested right, and it became a vested right when they expressed their election.] [3]

[If there were nothing more in the case, gentlemen of the jury, than this lease between Mr. Russell and Mr. Davenport, and the mining of this coal which was not paid for, Mr. Russell undoubtedly would have the right to re-enter at any time for the nonpayment of the royalty.   He would have had that right. It was the express agreement of the parties.   But he was not obliged to do that unless he chose to do so ; and if other parties acquired interests under Mr. Davenport, of whom Mr. Russell had sufficient notice—acquired such interest as would give them the right to know when they were obliged to pay Mr. Russell royalty, they must be given a hearing before their rights can be

affected; something must be brought to their knowledge or notice by Mr. Russell.] [4]

[You will observe, gentlemen of the jury, that up to that time, (June 1, 1893), Mr. Russell had done nothing, or said nothing, tending to show that he intended to insist upon a forfeiture of this lease. Up to that time he had done nothing or said nothing. In this conversation, if his testimony be true, he intimated that Davenport's time had expired; but there is nothing in the conversation, no assertion that the lease had been forfeited, and according to his own testimony he took no further step to enforce the forfeiture until September 23, 1893.] [5]

[Now then, what took place in June, 1893, when Mr. Shurtleff went to see Mr. Russell? Did Mr. Russell tell them that there was no royalty due, as is claimed on the part of the plaintiffs? If he did then he is bound by his declaration, and he could not enforce the forfeiture of the lease until eighteen months from that time. He would have no rights as against them, provided he knew they had an interest in it.] [6]

Defendants' point was as follows:

1. Under all the evidence in this case the verdict must be for the defendants. *Answer:* Refused. [1]

Verdict and judgment for plaintiffs.

*Errors assigned* were (1–6) above instructions, quoting them.

*H. M. Hannah* and *S. B. Price*, for appellants.—Any person coming into a right by the assignment of a contract is bound to make a careful inquiry as to the situation and rights of his assignor. And he is charged with all he might have learned by such an inquiry: Aderhold v. Supply Co., 158 Pa. 404.

The law seems to be that on a lease for years with such a condition, if the condition be broken, the interest of the defendant would be ipso facto, void by the breach, without any re-entry; and where the lease is made ipso facto void by the breach, then no subsequent recognition of the tenancy can be set up: Kenrick v. Smick, 7 W. & S. 47 ; Hamilton v. Elliott, 5 S. &. R. 374; Sheaffer v. Sheaffer, 37 Pa. 525; Davis v. Moss, 38 Pa. 353; Richards v. Nat. Gas Co., 130 Pa. 37 ; McKnight v. Kreutz, 51 Pa. 238.

The rule of law is that a tenant who has never been in pos-

session cannot maintain ejectment for the leased premises: Sennett v. Bucher, 3 P. & W. 392; Williams v. Downing, 18 Pa. 63; Nat. Gas Co. v. Phila. Co., 158 Pa. 327.

*Everett Warren*, of *Warren & Knapp*, and *C. Comegys*, *E. H. Shurtleff* with them, for appellees.—Mere silence, with knowledge, is evidence from which a jury may find an estoppel: Logan v. Gardner, 136 Pa. 588; Woods v. Wilson, 37 Pa. 379; Hill v. Epley, 31 Pa. 331.

It is a well known principle of law that positive acts of encouragement, or which help to mislead, will raise an estoppel, without any fraud, and irrespective of the party's knowledge of his own rights: Buchanan v. Moore, 13 S. & R. 304; Robinson v. Justice, 2 P. & W. 19.

The default in payment, if there were one, did not ipso facto create a forfeiture; nor in other words was the forfeiture absolute and self operating without regard to the acts or wishes of the parties: Gas Co. v. DeWitt, 130 Pa. 236; Wills v. Gas Co., 130 Pa. 222.

Equity will not permit a party to take advantage of a contract after a long course of dealing contrary to its terms, without notice that thereafter he intended to enforce his rights: Cogley v. Browne, 11 W. N. C. 224; Wanamaker v. McCaully, 11 W. N. C. 450; Times Co. v. Siebrecht, 11 W. N. C. 283.

OPINION BY MR. JUSTICE WILLIAMS, April 27, 1896:

A. B. Russell was in 1887 the owner in fee simple of a tract of land in Lackawanna county and of the minerals underlying it. In that year he made a coal lease of so much of this tract as was known as the "Weaver tract" to Joseph Davenport authorizing him to remove all the coal therefrom. The royalties were to be paid every six months, and if the amount due at the end of any half year remained unpaid for twelve months thereafter the lease was thereby forfeited, and the lessor was authorized to "enter and take possession without recourse to law." On the 23d day of September, 1893, the lessor did reenter and take possession, for the nonpayment of royalties twelve months after they had fallen due. The fact that this re-entry was authorized by the lease, as against the lessee, is not seriously denied. Its effect as between the parties to the

lease is to extinguish the leasehold estate, and restore the lessor to the possession as owner in fee simple. The plaintiffs in this action claim to hold under Davenport, the now evicted lessee, and have brought this action of ejectment to recover the possession from Russell, the owner. It is very clear upon this statement of the case that unless their title rises higher than that of the person from whom they obtained it, or in other words unless by contract or by estoppel they have secured rights as against Russell additional to those conferred on them by their agreement with Davenport, the lessee, their action cannot be maintained. What was their title? Comegys and Davis had obtained several refusals for his leasehold from Davenport in 1890 and 1891, one of the conditions being that they should test the character of the veins upon the tract by boring down through them. This they were unable to do, and so sold an equal one half interest in their refusal to Williams and Mayer in consideration that they would make the boring for them. In the winter of 1891–1892, Williams and Mayer caused the whole to be bored at an expense so far as the items indicate of some six or seven hundred dollars. After this was done, Comegys and Davis served a notice upon Davenport that they accepted the refusal signed by him on the 1st of July, 1891. They did nothing more, however. Now if it be conceded that this made a contract between Davenport of one part and Comegys and Davis of the other part by which they acquired the right to his leasehold estate, it simply placed them in his place as to the operation of the mines and the payment of royalties to Russell, the lessor. They took his lease subject to all his covenants, and they were bound to take notice of them. The fact that Russell knew that they were negotiating with Davenport gave them no rights as against him, except such as Davenport himself had, and imposed no duties on him towards them, except such as he was under towards his lessee under the terms of the lease. From 1890, when they began their negotiations with Davenport, down until September, 1893, when the lessor reentered and resumed possession, Comegys and Davis were bound to take notice of all the terms of the lease which they were seeking to acquire. They also knew, and were bound to take notice of, the fact that mining was all the time going on under the lease, and that royalties were falling due each half year for the

amount so mined.   They were bound to know whether these royalties were being paid, and what was the state of the accounts, the responsibility for which they were about to assume. They claim in this action that when they gave notice in April, 1892 of their acceptance of the option given them by Davenport they became by virtue thereof the legal owners of his leasehold estate.   If this be so they went by virtue of that acceptance under all the obligations which his covenants with his landlord imposed upon him, as well as those which their own agreement with Davenport involved.

Nevertheless, for fifteen months, or until July, 1893, they do not seem to have paid, offered to pay, or even inquired about the royalties due under the lease which they claimed to own. No extension was asked for, no promise to waive the covenants in the lease is alleged, no modification of the terms on which Davenport held is set up.   They have therefore no higher standing than their vendor so far as their contract rights are concerned.   It only remains to inquire if Russell has by his acts or declarations estopped himself from asserting his rights under the lease to Davenport.   It is said that he knew the plaintiffs were boring upon the land, and that he pointed out the lines of the tract and the outcrop of the coal to the plaintiffs or some of them while the work of exploration was in progress in the winter of 1891–1892.   Assuming this to be so it did not mislead any one as to the state of the accounts between himself and Davenport for it had not the remotest relation to that subject.   It did not induce any one to expend money or labor on an agreement to extend the time for payment of the royalties or to waive his right to re-enter for nonpayment, for the subject does not seem to have been so much as mentioned.   But it is further urged, and with great vigor, that in July, 1893, when Davis went with an attorney to call on Russell about the royalties, and to offer to pay them, he said there was nothing due, but if there was he would not take it from them.   How did this mislead them? Their position is that their title was complete when the notice of acceptance was given to Davenport fifteen months before this conversation took place.   All they had done and all they had paid out on account of their negotiations with Davenport had been done and paid before the notice of acceptance was given or from fifteen to eighteen months before they visited

Russell.  After that visit they did nothing, and they paid nothing, on account of anything that he is alleged to have said at that time.  There is therefore no element of an estoppel to be found in the statements alleged to have been made by Russell to Davis and his attorney.  There is nothing else that we have had our attention called to, or that we have been able to discover in the evidence on which the doctrine of estoppel can be invoked.  The view we have taken of this case requires us to sustain the fourth, fifth and sixth assignments of error.  The instructions to which they relate were clearly misleading.  In that part of the charge considered in the fourth assignment the learned judge correctly instucted the jury that as between Russell and his tenant Davenport, Russell had a clear and unquestionable right to re-enter under the terms of the lease and extinguish the leasehold.  He then added " if other parties acquired interests under Mr. Davenport of whom Mr. Russell had sufficient notice, acquired such interests as would give them the right to know when they were obliged to pay Mr. Russell royalty, they must be given a hearing before their rights can be affected.  Something must be brought to their knowledge or notice by Mr. Russell."  The jury could not fail to understand from this that the plaintiffs who claimed to have bought Davenport's leasehold were not bound to take notice of the terms of the lease or the rights of the lessor but were entitled to notice from him, and that he was bound to take notice of their rights whether he knew of their acceptance of the option or not.  This puts the duty to take notice on the wrong shoulders.  The same error pervades the excerpt from the charge complained of in the fifth assignment.  But the most surprising misdirection is that referred to in the sixth assignment.  It is as follows : " Now then what took place in June, 1893, when Mr. Shurtleff went to see Mr. Russell ?  Did Mr. Russell tell them that there was no royalty due as is claimed on the part of the plaintiffs ?  If he did, then he is bound by his declaration and he could not enforce the forfeiture of the lease until eighteen months from that time.  He would have no rights as against them provided he knew they had an interest in it."  Whether Mr. Russell would be bound by what he said would depend upon whether those to whom he said it had so changed their position on the faith of what he said as to make it inequitable for him to cor-

rect it.   But if these parties had acquired such interest as they had months before this statement was made, and they were not misled to their hurt by it, then he would not be bound, but would be at liberty to correct his statement and assert his legal rights.   As against Davenport the plaintiffs may have a good cause of action, but as against Russell on the evidence as presented on this record, no ground for recovery appears.   For this reason we have not thought it important to discuss the questions raised by the second and third assignments of error.

In this action against Russell the question is not whether the · plaintiffs have a valid assignment from Davenport on which they could recover against him but whether they have either on the footing of a contract or an estoppel a right to recover against the owner actually in possession.

The judgment is reversed and a venire facias de novo awarded.